ORAL ARGUMENT NOT YET SCHEDULED

**Nos. 23-1032, 23-1073**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

───────────────────────────

DAHUA TECHNOLOGY USA INC.
and
HIKVISION USA, INC.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

*Respondents*.

───────────────────────────

On Petition for Review of an Order of the
Federal Communications Commission

───────────────────────────

**INITIAL JOINT REPLY BRIEF OF PETITIONERS
HIKVISION USA, INC. AND DAHUA TECHNOLOGY USA, INC.**

───────────────────────────

*Counsel Listed on Next Page*

Andrew D. Lipman
Russell M. Blau
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave NW
Washington, DC 20004
(202) 739-3000
andrew.lipman@morganlewis.com
russell.blau@morganlewis.com

*Counsel to Dahua Technology USA, Inc.*

Christopher J. Wright
Timothy J. Simeone
John T. Nakahata
John R. Grimm
Deepika H. Ravi
Annick Banoun
HWG LLP
1919 M St. NW, 8th Floor
Washington, DC 20036
(202) 730-1300
cwright@hwglaw.com

James M. Cole
Tobias S. Loss-Eaton
Sidley Austin LLP
1501 K St. NW
Washington, DC 20005
(202) 736-8000
tlosseaton@sidley.com

August 30, 2023

*Counsel to Hikvision USA, Inc.*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ..................................................................1

ARGUMENT ...................................................................................................4

I.     Petitioners' Appeal Is Properly Before the Court............................................4

       A.     The FCC Reopened the Question of the Secure Networks Act's
              Interpretation. .................................................................................5

II.    The Commission Misconstrued the Relevant Statutes in Placing
       Petitioners' Video Surveillance Equipment on the Covered List. .................9

       A.     The Secure Equipment Act Did Not Ratify the Placement of
              Petitioners' Video Equipment on the Covered List. ............................9

       B.     Video Surveillance Equipment Does Not Satisfy the Covered List's
              Threshold Requirements. .................................................................11

       C.     The Commission Failed to Determine that Petitioners' Equipment
              Has Capabilities that Pose a National Security Threat. .....................17

III.   The Commission's Reading of Section 302a Is Unlimited, Atextual, and
       Unprecedented. ......................................................................................22

IV.    The Communications Assistance for Law Enforcement Act Cannot Justify
       the Order. .............................................................................................25

V.     The Commission's Interpretation of "Critical Infrastructure" Is Untenable.26

       A.     The Court Cannot Defer to the Commission. ....................................26

       B.     Deference or No, the Commission's Interpretation of "Critical
              Infrastructure" Cannot Stand.............................................................27

CONCLUSION .................................................................................................30

# TABLE OF AUTHORITIES[*]

## Cases

*Alvin Lou Media, Inc. v. FCC*,
   571 F.3d 1 (D.C. Cir. 2009) ...................................................................5

*Am. Fed'n of Lab. v. Donovan*,
   757 F.2d 330 (D.C. Cir. 1985) .............................................................24

*\*Am. Libr. Ass'n v. FCC*,
   406 F.3d 689 (D.C. Cir. 2005) .............................................................24

*Am. Tel. & Tel. Co. v. FCC*,
   978 F.2d 727 (D.C. Cir. 1992) .............................................................30

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) .............................................................................27

*\*China Telecom (Ams.) Corp. v. FCC*,
   57 F.4th 256 (D.C. Cir. 2022) .............................................................22

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) .............................................................................17

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) .............................................................................29

*\*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .............................................................................10

*\*Functional Music, Inc. v. FCC*,
   274 F.2d 543 (D.C. Cir. 1958) ..........................................................1, 8

*Georgetown Univ. Hosp. v. Bowen*,
   821 F.2d 750 (D.C. Cir. 1987) .............................................................26

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ..................................................................21

*JEM Broadcasting Co., Inc. v. FCC*,
   22 F.3d 320 (D.C. Cir. 1994) ................................................................9

*Krause v. Titleserv, Inc.*,
   402 F.3d 119 (2d Cir. 2005) .................................................................15

*Nat'l Mining Ass'n v. Dep't of the Interior*,

---

[*]   Authorities upon which we chiefly rely are marked with asterisks.

    70 F.3d 1345 (D.C. Cir. 1995) ................................................................8, 9

*Nat'l Ass'n of Broadcasters v. FCC*,
    39 F.4th 817 (D.C. Cir. 2022) ..................................................................23

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*,
    158 F.3d 135 (D.C. Cir. 1998) ..................................................................5

*Nat. Res. Def. Council v. EPA*,
    513 F.3d 257 (D.C. Cir. 2008) ..................................................................8

*Nat. Res. Def. Council v. EPA*,
    571 F.3d 1245 (D.C. Cir. 2009) ................................................................7

*\*NBC v. United States*,
    319 U.S. 190 (1943) ................................................................................25

*Norton v. United States*,
    581 F.2d 390 (4th Cir. 1978) ..................................................................11

*Pacific Networks Corp. v. FCC*,
    No. 22-1054, 2023 WL 5209560 (D.C. Cir. Aug. 15, 2023) ...................... 22, 23

*\*PanAmSat Corp. v. FCC*,
    198 F.3d 890 (D.C. Cir. 1999) ...............................................................5, 6

*People of the State of Cal. v. FCC*,
    905 F.2d 1217 (9th Cir. 1990) ................................................................27

*Pub. Citizen v. Nuclear Regul. Comm'n*,
    901 F.2d 147 (D.C. Cir. 1990) ..................................................................5

*Pub. Citizen, Inc. v. HHS*,
    332 F.3d 654 (D.C. Cir. 2003) ................................................................10

*Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*,
    29 F.3d 655 (D.C. Cir. 1994) ..................................................................24

*\*Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008) .............................................................1, 7

**Statutes**

47 U.S.C. § 1302 ................................................................................ 13, 15

47 U.S.C. § 151 ......................................................................................10

47 U.S.C. § 153 ....................................................................................2, 14

*\*47 U.S.C. § 1601 .................................................................. 2, 9, 11, 15, 28

47 U.S.C. § 1602 ......................................................................................7

47 U.S.C. § 1608.................................................................... 2, 11, 13

47 U.S.C. § 302a.................................................................... 3, 24, 25

47 U.S.C. § 303........................................................................25

Communications Assistance for Law Enforcement Act, Pub. L. No. 103-414,
  108 Stat. 4279 (1994) (codified at 47 U.S.C. § 1001 et seq.)................................3

National Defense Authorization Act for Fiscal Year 2019,
  Pub. L. 115-232, 132 Stat. 1636 (2018) ("2019 NDAA")...... 3, 16, 19, 20, 21, 27

Secure and Trusted Communications Networks Act of 2019,
  Pub. L. No. 116-124, 134 Stat. 158 (2020)..............................................2

Secure Equipment Act of 2021,
  Pub. L. 117-55, 135 Stat. 423 (2021).....................................................2

**Administrative Decisions**

*Computer III Remand Proceedings*, 14 FCC Rcd. 4289 (1999) ............................14

*Protecting Against National Security Threats,* Report and Order, Order, and
  Further Notice of Proposed Rulemaking, FCC 22-84, ET Docket No 21-232, EA
  Docket No. 21-233 (rel. Nov. 25, 2022) ........................................ 1, 5, 6, 8, 16, 26

*Protecting Against National Security Threats*, Notice of Proposed Rulemaking and
  Notice of Inquiry, 36 FCC Rcd. 10578 (2021) ....................................................6

*Protecting Against National Security Threats,* Second Report and Order, 35 FCC
  Rcd. 14284 (2020)......................................................................7, 12

**Other Authorities**

164 Cong. Rec. H4610 (2018) ....................................................................19

Commercial Facilities Sector, Cybersecurity & Infrastructure Sec. Agency,
  https://www.cisa.gov/topics/critical-infrastructure-security-and-
  resilience/critical-infrastructure-sectors/commercial-facilities-sector (last
  accessed Aug. 23, 2023)... ....................................................................29

Dan Strumpf, *Army Rips Out Chinese-Made Surveillance Cameras Overlooking
  U.S. Base*, WALL ST. J., Jan. 12, 2018. ..............................................19

Food and Agriculture Sector, Cybersecurity & Infrastructure Sec. Agency,
  https://www.cisa.gov/topics/critical-infrastructure-security-and-
  resilience/critical-infrastructure-sectors/food-and-agriculture-sector (last
  accessed Aug. 23, 2023). ....................................................................29

# GLOSSARY

| | |
|---|---|
| CALEA | 1994 Communications Assistance for Law Enforcement Act |
| Covered List or List | Covered List of communications equipment produced by foreign companies in the 2019 Secure and Trusted Communications Networks Act |
| FCC or Commission | Federal Communications Commission |
| NDAA | 2019 National Defense Authorization Act |
| NPRM | *Protecting Against National Security Threats*, Notice of Proposed Rulemaking and Notice of Inquiry, 36 FCC Rcd. 10578 (2021) |
| Petitioners | Hikvision USA, Inc. and Dahua Technology USA, Inc. |
| Section 302a | 47 U.S.C. § 302a |
| Section 303 | 47 U.S.C. § 303 |
| Section 889 | Section 889 of the 2019 National Defense Authorization Act |
| Section 1601 | 47 U.S.C. § 1601 |
| Secure Equipment Act | 2021 Secure Equipment Act |
| Secure Networks Act | 2019 Secure and Trusted Communications Network Act |

## INTRODUCTION AND SUMMARY

I.      Judicial review is not precluded even though the *Order*'s[1] errors have roots in a prior decision.  That decision barred federal subsidies for Covered List equipment, which did not affect Petitioners because they did not receive subsidies.  This *Order* effectively bans U.S. sales of their video equipment, enormously "alter[ing] the stakes of judicial review."  *Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008) (internal quotation omitted).  In effecting this sea change, the *Commission* sought comment on its authority and addressed many comments filed on that issue.

Petitioners may also challenge the *Order* as a new application of the Commission's earlier rule under *Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C. Cir. 1958).

II.     The Commission lacked authority to put Petitioners' video equipment on the Covered List:

A.      Congress did not ratify the Covered List by passing the Secure Equipment Act of 2021, Pub. L. 117-55, 135 Stat. 423 (2021) ("Secure Equipment Act").  That Act addressed only the List's consequences, not its scope.

---

[1]     *Protecting Against National Security Threats*, Report and Order, Order, and Further Notice of Proposed Rulemaking, FCC 22-84, ET Docket No 21-232, EA Docket No. 21-233 (rel. Nov. 25, 2022) ("*Order*").

B.    Petitioners' video equipment is not "essential" to the provision of broadband services, as required to be eligible for the Covered List.  47 U.S.C. § 1608(4).  Instead of defending the *Order*'s rewriting of "essential" to mean "used in," however, the Commission now says Petitioners' equipment is essential to video telecommunications.  But the statutory definition hinges on *broadband capability*, which Petitioners' equipment is not "essential to" under any reading of the term.

Nor are Petitioners' products "communications equipment" under the Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 134 Stat. 158 (2020) ("Secure Networks Act").  That Act focuses on securing equipment essential to broadband networks that provide transmission service, not equipment used to create content sent over those networks.

C.    The *Order* also fails to make the determination required by the Secure Networks Act that Petitioners' equipment poses a national security threat to broadband networks.  *See* 47 U.S.C. § 1601(b)(2) ("Section 1601").  Unlike the network equipment produced by Huawei—which the Commission, affirmed by the courts, determined to be capable of intercepting and misrouting traffic— Petitioners' equipment lacks capabilities needed to threaten national security.

The Secure Networks Act's cross-reference to the National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232, 132 Stat. 1636 (2018)

2

("2019 NDAA"), cannot bear the weight the Commission places on it. While the 2019 NDAA mentions Petitioners' video surveillance equipment, it does not even bar federal agencies from purchasing that equipment. The 2019 NDAA applies only to equipment that, unlike Petitioners' equipment, is capable of disrupting traffic or similarly harming networks. The Commission erred by concluding that, even if Petitioners' equipment is *not* capable of harming networks, it nevertheless must be placed on the Covered List.

III.     The Commission fails to justify its reliance on 47 U.S.C. § 302a. This decades-old provision addressing radio interference issues does not—as the Commission claims to have suddenly discovered—allow the agency to ignore the Secure Networks Act's limitations on FCC authority.

IV.     The Communications Assistance for Law Enforcement Act, Pub. L. No. 103-414, 108 Stat. 4279 (1994) (codified at 47 U.S.C. § 1001 et seq.) ("CALEA") does not, as the Commission belatedly claims, support the *Order*. The *Order* did not rely on CALEA, and the notion that prohibiting authorization for Covered List equipment may help ensure telecommunications carriers' compliance with CALEA does not show that CALEA provides authority to ban equipment from Petitioners—who are *not* carriers—from the authorization process.

V.     The Commission argues that its interpretation of "critical infrastructure" was reasonable and that Petitioners' examples of its overbreadth are

3

"farfetched."  But those examples were based on the Commission's statements.  If the Commission did not mean what it said, then regulated parties cannot know what it meant, and the regulations would be invalid for that reason alone.  And the suggestion that parties can seek clarification through further Commission proceedings is legally insufficient, unrealistic, and would create an administrative nightmare.

## ARGUMENT

### I.  PETITIONERS' APPEAL IS PROPERLY BEFORE THE COURT.

This Court's precedents permit parties to challenge agency actions outside the Hobbs Act's 60-day filing period when an agency reopens an earlier issue or applies it in a new way.  Any other policy would allow agencies to enact seemingly innocuous regulations and later attach drastic consequences to those rules without having to account for their authority to do so.

In the *Order*, the Commission expressly declined to opine on whether a challenge to its Secure Networks Act construction would be untimely, instead addressing the construction "on the merits."  *Order* ¶ 168 (JA ___).  In arguing that Petitioners' appeal is untimely, the Commission's brief thus "invokes reasoning that it failed to make in its response to comments"—which this Court "do[es] not ordinarily consider[.]"  *PanAmSat Corp. v. FCC*, 198 F.3d 890, 897 (D.C. Cir. 1999).

4

**A.    The FCC Reopened the Question of the Secure Networks Act's Interpretation.**

A party may challenge an agency's earlier decision when the agency reopens the issue.  *See Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 8 (D.C. Cir. 2009); FCC Br. 38.  Reopening can occur when "an agency's response to comments explicitly or implicitly shows that the agency actually reconsidered the rule[.]"  *PanAmSat*, 198 F.3d at 897 (quoting *Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141 (D.C. Cir. 1998)).  This Court examines whether the agency: "(1) proposed to make some change in its rules or policies, (2) called for comments only on new or changed provisions, but at the same time (3) explained the unchanged, republished portions, and (4) responded to at least one comment aimed at the previously decided issue."  *Pub. Citizen v. Nuclear Regul. Comm'n*, 901 F.2d 147, 150 (D.C. Cir. 1990).

All of that happened here.  The Commission "described the previous order in some detail and then proposed new rules to build on those actions."  FCC Br. 39 (internal quotation marks and modifications omitted).  The Notice of Proposed Rulemaking ("*NPRM*") here "s[ought] comment" on whether the Commission had "legal authority" to "restrict further equipment authorization, and the importation and marketing" of equipment on the Covered List in order to "fulfill[] . . . Commission responsibilities under the Secure Networks Act."  *Protecting Against National Security Threats*, Notice of Proposed Rulemaking and

5

Notice of Inquiry, 36 FCC Rcd. 10578, ¶ 65 (2021) (JA ___ – ___).  It also sought

comment on "modifications or clarifications" needed "to ensure that the rule is

clear as to its scope and effect[.]"  *Id.* ¶ 41 (JA ___)  And multiple parties—not just

Petitioners—provided "extensive comments," *Order* ¶ 152 (JA ___),[2] on the

proper interpretation of the Secure Networks Act.  The Commission rejected those

comments "on the merits," *id.* ¶ 168 (JA ___), instead of proceeding "as if the

matter were settled" already, *PanAmSat*, 198 F.3d at 897.  The Commission is thus

wrong to suggest that Petitioners merely lobbed in "unsolicited comments[s]."

FCC Br. 39.

     Equally important, a "constructive reopening" occurs when an agency's

"revision of accompanying regulations significantly alters the stakes of judicial

review as the result of a change that could have not been reasonably anticipated."

*Nat. Res. Def. Council v. EPA*, 571 F.3d 1245, 1266 (D.C. Cir. 2009) (per curiam)

(cleaned up) (quoting *Sierra Club*, 551 F.3d at 1025).  The *Order* changed the

stakes for Petitioners dramatically.  Under the earlier *Supply Chain Second*

---

[2]  *See, e.g.*, Telecommunications Industry Association Comments at 6; Letter
from Jennifer B. Tatel and Clete D. Johnson (Sept. 14, 2021) at 2–4; Letter
from Bennett L. Ross (Sept. 27, 2022) at 1–2; Letter from Bennett L. Ross
(Sept. 29, 2022) at 1–2; NTCA Reply Comments at 2; Motorola Solutions, Inc.
Reply Comments at 4–5; U.S. Chamber of Commerce Reply Comments at 3;
NCTA Comments at 4–9.  (All documents cited were filed in ET Docket Nos.
21-232 and/or 21-233) (JA ___, ___ – ___, ___ – ___, ___ – ___, ___, ___ – ___,
___, ___ – ___).

*Order*—*see Protecting Against National Security Threats*, Second Report and Order, 35 FCC Rcd. 14284, ¶ 52 (2020) ("*Supply Chain Second Order*")—the Covered List triggered ineligibility for federal subsidies that Petitioners did not receive.  *See* Petitioners' Br. 11–12 ("Br.").  It would have been irrational to incur the burden of appealing an order that caused Petitioners no concrete injury—in the unlikely event that they would have had standing to do so.  Petitioners also could not have "reasonably anticipated," *NRDC*, 571 F.3d at 1266, that the Commission would later expand its misinterpretation of a statute barring subsidies for "capital expenditures necessary for the provision of advanced communications service," 47 U.S.C. § 1602(a)(1), to *also* bar Petitioners from the unrelated equipment-authorization process.  The *NPRM* thus proposed a "sea change" which restarted the time for review.  *See Sierra Club*, 551 F.3d at 1025.

### B.    The *Order* is a New Application Under *Functional Music*.

Under *Functional Music*, the Hobbs Act allows "subsequent examination of a rule where properly brought before this court for review of further [FCC] action applying it."  274 F.2d at 546.  This applies here:  The *Order* "build[s] upon" the prior orders by adopting a new "prohibit[ion on] authorization of equipment" on the Covered List.  *Order* ¶ 1 (JA ___–___).

Although Motorola says *Functional Music* applies only to "party-specific administrative actions," Motorola Br. 15, this Court's cases show otherwise.  In

7

*Natural Resources Defense Council v. EPA*, an environmental group challenged an EPA *rule* built on a framework set out in an earlier rule. 513 F.3d 257, 259–60 (D.C. Cir. 2008). The rule was thus "an application of the principles developed in the prior rule" that "appears to depend for its legality on the legality of that prior rule." *Id.* at 260. Without reaching the issue, this Court observed that there was an argument that "the timeliness issue here is governed by the established doctrine that parties claiming substantive invalidity of a rule for which direct statutory assault is time-barred are nonetheless free to raise their claims in actions against agency decisions *applying* the earlier rule." *Id.*

Motorola also argues that review here would "make a mockery" of congressional intent to limit the time to appeal agency orders. *See* Motorola Br. 13 (citing *Nat'l Mining Ass'n v. Dep't of the Interior*, 70 F.3d 1345, 1351 (D.C. Cir. 1995)). But *National Mining Association* involved the Surface Mining Control and Reclamation Act of 1977, not the Hobbs Act. 70 F.3d at 1351. This Court drew a sharp distinction between the former, which permits an untimely appeal "only to the extent that it is sought on grounds arising after the sixtieth day," *id.*, and the latter, which does not "totally . . . foreclose review after the statutory period[.]" *Id.*[3]

---

[3] Parties cannot bring *procedural* challenges after 60 days. *JEM Broadcasting Co., Inc. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994). But Petitioners can

8

## II. THE COMMISSION MISCONSTRUED THE RELEVANT STATUTES IN PLACING PETITIONERS' VIDEO SURVEILLANCE EQUIPMENT ON THE COVERED LIST.

Petitioners do not contend that the Commission would lack authority to place equipment they manufacture on the Covered List *if* it were network equipment with the dangerous capabilities listed in Section 1601(b)(2). Nor do they dispute the Commission's power to bar authorization for equipment that is properly listed. But Petitioners' video equipment does not belong on the List.

The Commission may add equipment to the List "if and only if" it meets the Secure Networks Act's requirements. 47 U.S.C. § 1601(b). The Commission's general authority under provisions such as Section 1 of the Communications Act, 47 U.S.C. § 151, is therefore beside the point. The Secure Networks Act is a later-enacted, comprehensive statute that targets the specific subject matter at issue and therefore controls. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000).

### A. The Secure Equipment Act Did Not Ratify the Placement of Petitioners' Video Equipment on the Covered List.

The Commission argues that the Secure Equipment Act mandates that equipment on the Covered List at the time of that Act's enactment must be kept on

---

challenge regulations that "exceed the scope of the FCC's substantive authority [and] . . . are premised on an erroneous interpretation of a statutory term," which falls squarely under *Functional Music*. *See JEM Broadcasting*, 22 F.3d at 325.

the List regardless of whether it meets the Secure Networks Act's requirements. FCC Br. 32–33.  But the Secure Equipment Act does not address what equipment belongs on the Covered List.  In fact, the Commission's inference is backwards:  In response to the *NPRM*, commenters challenged both the Commission's attempt to expand the consequences of being listed *and* its interpretations of the Secure Networks Act.  Congress addressed the former but not the latter.  The Commission's argument that Congress "ratified" the placement of Petitioners' equipment on the Covered List is thus incorrect.  *See Pub. Citizen, Inc. v. HHS*, 332 F.3d 654, 668 (D.C. Cir. 2003) (ratification doctrine inapplicable where Congress neither "re-enacted . . . nor amended" the specific provisions underlying the disputed interpretation).

The Commission invokes a statement in a House mark-up staff memo stating that the Secure Equipment Act "would prevent further integration and sales of Huawei, ZTE, Hytera, Hikvision, and Dahua."  Br. 43 n.7.  But even if "the intent of the committee staff" were properly treated as "the intent of Congress," *but see Norton v. United States*, 581 F.2d 390, 396 (4th Cir. 1978), this statement does not suggest that equipment must remain on the Covered List if a court determines that the Commission erred in listing it.

10

**B.    Video Surveillance Equipment Does Not Satisfy the Covered List's Threshold Requirements.**

Section 1601(a) limits the Covered List to "communications equipment or services," which—for purposes of the Secure Networks Act—means equipment essential to the provision of "broadband telecommunications capability," that is, broadband *service*, excluding content.  47 U.S.C. § 1601(a); 47 U.S.C. § 1608(4). Petitioners' video equipment is neither "essential" to the provision of broadband nor "communications" equipment.

**1.    Petitioners' Equipment Is Not Essential to the Provision of Broadband Services.**

The Commission does not contest that it is possible to provide broadband service without video equipment.  Nor does it contest that Petitioners' equipment is not deployed in internet service provider networks to handle traffic.  Petitioners' equipment thus is not "essential" to the provision of "advanced communications service" under the term's ordinary meaning—that is, "absolutely necessary," "indispensably requisite," "of the utmost importance," and "basic and necessary." Pet. Br. 28.

The Commission cites no dictionary definition or common understanding under which video equipment could be "essential" to broadband service.  It cites only the agency's own assertion that reading "essential to" as meaning "used in" "'will provide a bright-line rule that will ease regulatory compliance and

11

administrability.'"  FCC Br. 44 (quoting *Supply Chain Second Order* ¶ 52).  These are not grounds to ignore the meaning of the words that Congress used.

Nor does the Commission defend "used in" as a permissible interpretation of "essential to."  *See* FCC Br. 44–45.  Rather, it contends that "advanced telecommunications include video telecommunications, like the services enabled by petitioners' products."  *Id.* 45.  Thus, the Commission says, "petitioners' video cameras and recorders . . . are essential to certain types" of "advanced telecommunications—"namely, the transmission of video information over the internet for video surveillance."  *Id.*  This argument would render "essential" any internet-connected peripheral device with a camera, such as a smart refrigerator that can transmit video information over the internet to aid restocking.  But smart refrigerators clearly are *not* essential to the provision of broadband *service*.

The Commission's argument misreads the statute.  "The term 'advanced telecommunications capability'" (which § 1608 incorporates to define "advanced communications service") "is defined . . . as *high-speed, switched, broadband telecommunications capability* that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology."  47 U.S.C. § 1302(d)(1) (emphasis added); *id.* § 1608(1).  It is thus a "broadband telecommunications capability" to which equipment must be "essential."  *See id.* § 1608(4).  "[V]ideo telecommunications," whether for video

12

surveillance or refrigerator restocking, is merely one function that such capability

may "enable[]." *Id.* § 1302(d)(1). Those functions are not themselves "advanced

communications service." If equipment is not essential to *broadband capability*, it

is not "essential to the provision of advanced communications service." *Id.*

§ 1608(4).

Nor does the Commission respond to Petitioners' showing that broadband

*service* "'does not include content'" and that the videos produced by Petitioners'

equipment "play no role in the *delivery* of broadband telecommunications

services." Br. 27, 31 (citations omitted). The essential equipment that belongs on

the Covered List (if it meets the other statutory requirements) is limited to

equipment needed to *provide* broadband transmission service—a function

performed by internet service providers like Comcast, Verizon and AT&T—which

does not include peripheral equipment that may attach to those networks.[4] This

reading accords with the Secure Networks Act's fundamental purposes to (1) limit

subsidies for broadband deployment; and (2) reimburse providers for replacing

essential equipment in broadband networks.

---

[4] The Act defines "telecommunications" as "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50). "[T]elecommunications capability" in Section 1608(4) thus relates to *transmission* capability rather than the capability to create content.

13

The distinction between network equipment and peripheral equipment—often called "customer premises equipment"—is long-standing and reflected in the Communications Act and the Commission's regulations.  As the Commission has consistently recognized, customer-premises equipment is "*attached* to the interstate network"—it is not itself network equipment.  *See, e.g.*, *Computer III Remand Proceedings*, 14 FCC Rcd. 4289 ¶ 4 (1999) (emphasis added).  And as explained in Hikvision's comments to the Commission, since the 1960s, the Commission has regulated the network equipment used to *transmit* content under the Communications Act but has not regulated customer-premises equipment used to *create* content without explicit authority from Congress.  Hikvision Comments, ET Docket No. 21-232, at 44 (filed Sept. 20, 2021) ("Hikvision Comments") (JA ___).

Motorola argues that the meaning of "essential" "varies considerably" by "context."  Motorola Br. 22 (quoting *Krause v. Titleserv, Inc.*, 402 F.3d 119, 126 (2d Cir. 2005)).  But Motorola does not show any other possible meaning of "essential" in *this* context.  When something must be "essential to" a specific technological "capability," 47 U.S.C. § 1302(d)(1), only one meaning makes sense—"necessary, indispensable."  *See Krause*, 402 F.3d at 126.  Even Motorola's alternative definition would not change matters since video equipment is not part of "the essence or intrinsic nature of" broadband capability.  *See* Motorola Br. 23.

14

Moreover, Motorola is wrong that nothing would be "essential" in Petitioners' view.  Motorola seems to assume that Petitioners urge evaluating whether *each individual piece of equipment* is essential, such that "redundancies" to safeguard the network would render all equipment non-essential.  *See* Motorola Br. 24.  But Petitioners' argument is that video surveillance equipment *as a class* is not essential to broadband.

> ### 2.  Petitioners' Video Surveillance Equipment Is Not "Communications Equipment."

The Secure Networks Act limits the Covered List to "communications equipment or services."  47 U.S.C. § 1601(a).  If Congress meant Petitioners' equipment to be on the List, it would have used the term "video surveillance equipment" in the Secure Networks Act.

The Commission's response again boils down to the claim that essential "communications equipment" includes video surveillance equipment because that equipment may be "used in" communications services.  FCC Br. 47 n.9, (quoting *Order*, ¶ 170).  And again, that is an implausible reading of the statute.  Congress's focus on "communications equipment" in the Secure Networks Act—rather than "video surveillance and telecommunications equipment" as used in Section 889(f)(3)(B)—reinforces that Congress intended to limit the Covered List to equipment that is essential to the provision of broadband services, excluding peripheral content-producing equipment.

Motorola says the Secure Networks Act's cross-reference to Section 889(f)(3) shows that video surveillance equipment *is* communications equipment. But Congress would not have used a different term ("communications" equipment rather than "telecommunications" equipment) with a specific Secure Networks Act definition (only equipment essential for the provision of broadband) if it meant to say that video surveillance equipment is communications equipment. Moreover, a cross-reference to a definition in another statute cannot override the straightforward definition Congress provided in the Secure Networks Act itself—or that Act's requirement that equipment be "essential."

Motorola's invocation of legislative history in this connection, *see* Mot. Br. 28, proves nothing. That one Senator mentioned "cameras" in connection with Section 889 (which addresses cameras) says nothing about what Congress meant in the Secure Networks Act (which does not). *Cf. Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) (noting that the "remarks of a single legislator" are not dispositive in analyzing legislative history).

Motorola also suggests that Dahua conceded its video equipment should be on the Covered List. *See* Motorola Br. 20–21. Not so. Dahua argued that "[t]he Commission must interpret and apply the scope of the Covered List in a manner consistent with the Secure Networks Act[,]" which limits the List to communications equipment and not "non-communications equipment" such as

16

video cameras.  Letter from Dahua to Marlene H. Dortch, ET Docket No. 21-232, at 3, 10 (filed Apr. 7, 2022) (JA ___, ___).[5]  Dahua merely acknowledged that its products could be listed *if* it started producing network equipment.  *Id.* at 10 n.35.

### C.    The Commission Failed to Determine that Petitioners' Equipment Has Capabilities that Pose a National Security Threat.

The Secure *Networks* Act aimed to make broadband *networks* more secure. Section 1601(b)(2) thus provides that equipment may be placed on the Covered List only if it has certain capabilities to disrupt those networks.  Determining whether equipment has those capabilities is the main task Congress assigned to the Commission—but the agency failed to do so with respect to Petitioners' video surveillance equipment.

Routers and other equipment that handle network traffic are capable of misrouting or disrupting traffic within the meaning of Section 1601(b)(1).  But Petitioners' video cameras are not, because, like a smart refrigerator, they do not carry or direct traffic in the first place.  Br. 38–39.  Nor is Petitioners' equipment capable of looking into others' data, and the Commission does not contend

---

[5]    Petitioners also noted that the initial purpose of the Secure Networks Act was to identify equipment that the federal government would pay small broadband providers to "rip and replace"—yet Congress did not make funds available to remove and replace Petitioners' video surveillance equipment.  Br. 29–30.  The Commission's response—that Congress wanted to fund only the replacement of Huawei and ZTE equipment, FCC Br. 46–47—confirms that Congress did *not* intend for Petitioners' equipment to be placed on the Covered List.

17

otherwise.  In short, Petitioners' equipment does not have any capability listed in Section 1601(b)(2) because it is not part of the transmission network—rather, Petitioners' equipment is among the countless peripheral devices that may be *attached* to a network to generate or receive content.[6]

The Commission does not dispute that Petitioners' equipment cannot misroute traffic or intercept data and thus does not satisfy Sections 1601(b)(1) and (b)(2).  The Commission instead relies on Section 1601(b)(3), which speaks of "otherwise posing" a threat to national security.  FCC Br. 48.  Even with respect to that sub-provision, however, the Commission does not explain how Petitioners' equipment could harm national security.  The Commission's brief instead repeats the *Order*'s claim that *Congress* determined that Petitioners' equipment has the dangerous capabilities described in Section 1601(b)(2) by cross-referencing Section 889(f)(3) in the prior subsection of the Secure Networks Act.  That is incorrect.

Section 889(f)(3) lists Petitioners' "video surveillance and telecommunications equipment" as equipment that federal agencies may not purchase in certain circumstances.  2019 NDAA, § 889(f)(3)(B).  But the

---

[6] Hikvision explained how its equipment functions and why it cannot intercept data or misroute traffic in its comments to the Commission.  Hikvision Comments at 7–15 (filed Sept. 20, 2021) (JA ___–___).

Commission fails to rebut Petitioners' showing, Br. 32, that Section 889 is about how the government spends its own money, while the Secure Networks Act is designed to protect broadband networks.  Moreover, the use of foreign equipment is presumably more likely to pose national security threats when the government must rely on it than when private networks use it—although no one has shown how Petitioners' equipment poses a threat in either context.[7]

Even federal agencies may purchase Petitioners' equipment unless it has capabilities very similar to those enumerated in Section 1601(b)(2).  Section 889 provides that federal funds *may* be used to purchase equipment that "cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles."  2019 NDAA, §§ 889(a)(2)(B) & (b)(3)(B).  Petitioners' equipment does not meet either prohibited criterion, and neither Congress nor any agency has determined otherwise.

The Commission also claims that the General Services Administration's procurement rules "prohibit the purchase of video surveillance and

---

[7] Section 889's reference to Hikvision resulted from Representative Hartzler's visit to Fort Leonard Wood, *see* 164 Cong. Rec. H4610 (2018), where she found the use of Hikvision cameras "'very concerning.'"  Dan Strumpf, *Army Rips Out Chinese-Made Surveillance Cameras Overlooking U.S. Base*, WALL ST. J., Jan. 12, 2018.  The Army removed the cameras but "'never believed'" them to be a security risk because they "weren't connected to the military network."  *Id.*

19

telecommunications equipment" from Petitioners.  FCC Br. 52 n.11.  That is

wrong.  That agency published a decision tree directing prospective federal

purchasers first to ask whether equipment is listed in Section 889(f)(3); if the

answer is "yes," the purchaser must then ask whether the equipment can "route or

redirect user data traffic or permit visibility into any user data or packets that such

equipment transmits or otherwise handles?"  *See* App. at 1a.  "If No," the guidance

states that the prohibition does not apply.  *Id.* at 2a.

Moreover, as Petitioners showed, Br. 34–35, if the cross-reference in Section

1601(b)(1) were sufficient to satisfy the capability requirement of Section

1601(b)(2), the latter subsection would be surplusage.  The Commission responds

by claiming Section 889(f)(3) refers to "'a specific piece of equipment.'"  FCC Br.

50 (citation omitted).  "It is only where" such a determination has been made, the

Commission argues, "that the same determination will satisfy both section 2(b)(1)

and 2(b)(2)(c)."  *Id*.  But each of the other three sub-provisions in Section 889(f)

also require a "specific determination" with respect to "communications

equipment" before it is placed on the List.  *See* 2019 NDAA, §§ 889(f)(1), (3).

The Commission engages in *post hoc* rationalization by suggesting that

Section 1601(b)(2)'s requirements are met notwithstanding that the *Order* made no

such finding.  But the Commission's brief cites only comments from "one

technology security firm," FCC Br. 51–52 & n.10, which the *Order* discusses in

the *background* section and which the Commission never credited or adopted. The

Commission cannot bring itself to claim these comments show the capabilities that

Section 1601(b)(2) requires. It says only that, if Petitioners' equipment were

"compromised" by hackers—a risk that all such equipment faces if the user does

not take sufficient precautions—a "harmful interaction with a communications

network" would result. FCC Br. 51. That is not the statutory standard, and the

Commission does not contend that network traffic would be misrouted or

disrupted.

Motorola emphasizes the Fifth Circuit's decision holding that Huawei's

communications equipment is not eligible for Commission subsidies. *See Huawei

Techs. USA, Inc. v. FCC*, 2 F.4th 421, 460 (5th Cir. 2021). But Huawei's

equipment is precisely the sort of core network equipment about which Congress

was concerned. Petitioners' is not. Br. 11.

The Commission relies heavily on *China Telecom (Ams.) Corp. v. FCC*, 57

F.4th 256 (D.C. Cir. 2022). But the contrast between this case and *China Telecom*

is striking. In that case, the "Team Telecom" national security experts

concluded—and this Court found, and China Telecom did not dispute—that China

Telecom is "capable of passively monitoring unencrypted content and actively

misrouting traffic," "capable of disrupting data and controlling signaling

operations," and "capable of rerouting U.S. communications traffic, including by

redirecting it through China." *Id.* at 266.  Neither any national security expert nor the Commission has reached such conclusions here.[8]

Nor is *Pacific Networks Corp. v. FCC* relevant here.  No. 22-1054, 2023 WL 5209560 (D.C. Cir. Aug. 15, 2023).  It did not involve the Secure Networks Act nor the Secure Equipment Act.  In addition, the Commission determined, and the Court agreed, that "Pacific Networks threatened national security by making vast amounts of sensitive information available to China."  *Id.* at *3.  The petitioners there had access to detailed call records of U.S. customers and collected personally identifiable information.  *Id.* at *2.  None of that is true here—Petitioners do not even know who purchases their equipment through third-party U.S. retailers.  *See* Br. 6–9.

## III.  THE COMMISSION'S READING OF SECTION 302a IS UNLIMITED, ATEXTUAL, AND UNPRECEDENTED.

The Commission seeks to circumvent the Secure Networks Act's limits by finding nearly unlimited authority to regulate equipment under Section 302a of the Communications Act.  But the Commission cannot "discover" broad regulatory authority that is inconsistent with both the text and the case law in a decades-old

---

[8]  Motorola says Petitioners do not argue that "their equipment does not actually" pose a national-security risk.  Mot. Br. at 28.  That is wrong.  Hikvision Comments at 7–15 (JA___–___).

statute—let alone when that supposed power contradicts a more recent, more specific law.  Br. 40–46.

The Commission's argument appears to be that (1) Title III gives the Commission authority to make rules governing interference potential; and (2) the equipment authorization rules *in general* address interference issues; therefore (3) the Commission can adopt any *equipment authorization rule* it thinks serves the public interest—regardless of whether the specific rule addresses interference. FCC Br. 34.  In other words, as long as some of the equipment authorization rules address interference, Section 302a authorizes any such rule.

Courts do not evaluate agencies' rulemaking power in this generalized way. "An agency must identify statutory authority for any action it takes," *Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022), so this Court "examin[es] . . . the authority conferred by Congress on the [agency] with respect to each regulation in question," *Am. Fed'n of Lab. v. Donovan*, 757 F.2d 330, 341 (D.C. Cir. 1985).  And a congressional delegation to make regulations "governing" a particular subject does not authorize a rule unrelated to that subject merely because the agency groups it together with rules that are so related.  Properly read, Section 302a empowers the Commission to make equipment-authorization rules *only to the extent that* those rules "govern[] . . . interference potential."  47 U.S.C. § 302a(a).  The Commission's contrary view would give it unlimited power to

make *any* rules it deems in the public interest, so long as they can be described as part of the equipment-authorization scheme.  That is not the law.

The Commission ignores *American Library Association v. FCC*, which observed that Section 302a "was intended by Congress to give the Commission authority it did not previously possess over receiver equipment . . . . to solve . . . interference problem[s]."  406 F.3d 689, 707 (D.C. Cir. 2005).  This Court found that "inconsistent with the FCC's current view that it always has had sweeping jurisdiction over receiver apparatus under Title I[.]"  *Id.*  The same is true here—Section 302a gave the Commission authority to address interference issues by regulation but did not provide more "sweeping jurisdiction."  *See Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994) ("categorically" rejecting the agency's "suggestion that it possesses *plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area" (emphasis in original)).

The lone case the Commission cites, *NBC v. United States*, 319 U.S. 190 (1943), supports Petitioners' reading of Section 302a.  That case involved the Commission's Section 303(i) authority to "from time to time, as public convenience, interest, or necessity requires, . . . make special regulations applicable to radio stations engaged in chain broadcasting."  47 U.S.C. § 303(i).  When the Commission invoked that authority to limit the use of "chain" (now called

24

"network") broadcasting requirements in affiliation agreements, opponents claimed that the agency had exceeded its authority under Section 303.  The Supreme Court found that while the "Act does not explicitly say that the Commission shall have power to deal with network practices found inimical to the public interest," Congress granted the agency "expansive powers" to make "special regulations applicable to radio stations engaged in chain broadcasting."  319 U.S. at 219–20 (quoting 47 U.S.C. 303(i)).  Here, Congress similarly granted the Commission "expansive powers" to regulate the "interference potential of devices."  47 U.S.C. § 302a(a).  But "[g]eneralities unrelated to the living problems of radio communication of course cannot justify exercises of power by the Commission" under Title III.  *NBC*, 319 U.S. at 219.

## IV.   THE COMMUNICATIONS ASSISTANCE FOR LAW ENFORCEMENT ACT CANNOT JUSTIFY THE *ORDER*.

The Commission claims that that the Communications Assistance for Law Enforcement Act "separately . . . affords the FCC authority to issue the *Order*," FCC Br. 36, and that Petitioners waived any contrary argument.  *Id.* at 36–37 & n.6.  Nonsense.  Petitioners' opening brief did not challenge this understanding of CALEA because the *Order* did not advance it.

The over-one-hundred-page *Order* barely mentions CALEA, merely suggesting that "the rules we adopt here will help ensure that equipment that carriers include in their networks will not include . . . unlawful interception

25

capabilities . . . ." *Order* ¶ 41 (JA ___).  But saying that the rules may "help

ensure" that carriers honor their CALEA obligations is a far cry from the claim that

CALEA provides independent authority to adopt them.   FCC Br. 36.  And the

"Ordering Clauses" of the *Order* underscore just how unexpected this claim is.

There, the Commission stated that it adopted the *Order* "pursuant to the authority

found in sections 4(i), 301, 302, 303, 309(j), 312, 403, and 503 of the

Communications Act . . . and the Secure Equipment Act."  *Order* ¶ 342 (JA ___).

CALEA is not included.  The Commission's "belated attempt to justify the rule"

on this ground therefore fails.  *See Georgetown Univ. Hosp. v. Bowen*, 821 F.2d

750, 759 (D.C. Cir. 1987), *aff'd*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204

(1988).

In any event, CALEA applies to *carriers*, and the Commission has never

explained how barring Petitioners—who are not carriers—from the authorization

process could be *reasonably* ancillary to ensuring that carriers honor their

responsibilities to aid law enforcement under CALEA.  *See People of the State of*

*Cal. v. FCC*, 905 F.2d 1217, 1240 n.35 (9th Cir. 1990).

## V.    THE COMMISSION'S INTERPRETATION OF "CRITICAL INFRASTRUCTURE" IS UNTENABLE.

### A.    The Court Cannot Defer to the Commission.

The Commission does not dispute that its interpretation of Section 889

would not warrant *Chevron* deference because Section 889 applies across the

government.  Br. 47.  But the agency still demands deference here because—while the term "critical infrastructure" is admittedly "incorporated from" Section 889— "the agency interpreted its scope only for the purposes of its own rules."  FCC Br. 56 n.12.

This claim overlooks that the scope of "critical infrastructure" *in Section 889* limits how Petitioners' equipment can be included on the Covered List.  If their equipment is not being used "[f]or the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes," 2019 NDAA, § 889(f)(3)(B), it cannot be listed.  *See* 47 U.S.C. §§ 1601(b), (c)(3).  Thus, the Commission's regulations *cannot* use the term "critical infrastructure" any differently than Section 889 does, since doing so would violate the Secure Networks Act.  Hence, the Commission must be interpreting Section 889, so deference is inappropriate.

## B.    Deference or No, the Commission's Interpretation of "Critical Infrastructure" Cannot Stand.

The Commission acknowledges the extreme breadth of its interpretation of the term "critical infrastructure"—that "*any systems or assets*, physical or virtual, *connected to*" any critical infrastructure sector may be "critical infrastructure." FCC Br. 55 (emphasis added).  Likewise, the Commission admits that "commercial facilities" are a critical infrastructure sector.  *Id.* 25.  Taken together, those admissions confirm that, on the Commission's interpretation, "any sector of

the economy" qualifies as "critical infrastructure," including facilities as mundane (and non-critical) as laundromats and used car lots. *Id.* 56.

The Commission responds by deflecting Petitioners' concerns as premature, arguing that laundromats and used car lots are "farfetched examples," *id.* 57, that "do not reasonably fit into the Commission's description of critical infrastructure[,]" *id.* 31—but without explaining why. Laundromats and used car lots are "commercial facilities." The Cybersecurity & Infrastructure Security Agency explains that "commercial facilities" include facilities that "operate on the principle of open public access, meaning that the general public can move freely without the deterrent of highly visible security barriers." Commercial Facilities Sector, Cybersecurity & Infrastructure Sec. Agency, https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/commercial-facilities-sector (last accessed Aug. 23, 2023). If "retail centers" and "shopping malls" are "commercial facilities," *id.*, so are laundromats and used car lots. And even setting aside those two examples, there are more than a thousand shopping malls in America and almost one million restaurants (which the Cybersecurity & Infrastructure Security Agency includes within the "food and agriculture" sector). *See* Food and Agriculture Sector, Cybersecurity & Infrastructure Sec. Agency, https://www.cisa.gov/topics/critical-infrastructure-security-and-resilience/critical-infrastructure-sectors/food-and-

agriculture-sector (last accessed Aug. 23, 2023).  The point stands: millions of small businesses are "critical infrastructure" according to the Commission.

That's unreasonably overbroad.  Yet instead of offering a limiting principle, the Commission says its interpretation should not be taken at face value.  That request presents serious constitutional questions because "clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  The Commission's just-trust-us approach is no more than a license for arbitrary and discriminatory enforcement. *Id.*

The Commission further argues that the Court should not disturb its vague and overbroad interpretation of "critical infrastructure" because Petitioners (or others) can request a declaratory ruling to find out whether a potential use truly is "critical infrastructure" (for which Petitioners cannot market their products). *See* FCC Br. 56–57.  But agencies cannot play the "administrative law shell-game" of adopting an unlawful rule while directing regulated entities to seek clarification in future proceedings. *See Am. Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 732 (D.C. Cir. 1992).

This suggestion is also impractical.  There are millions of "commercial facilities"—only some of which, according to the Commission, qualify as "critical infrastructure."  Petitioners cannot possibly request declaratory rulings each time

they seek to sell video equipment to a small business—and even if they could, the

result would be a bureaucratic quagmire.

## CONCLUSION

This Court should hold unlawful and set aside the *Order*.


Dated: August 30, 2023                    Respectfully submitted,


                                          /s/ Christopher J. Wright


Andrew D. Lipman                          Christopher J. Wright
Russell M. Blau                           Timothy J. Simeone
MORGAN, LEWIS & BOCKIUS LLP               John T. Nakahata
1111 Pennsylvania Ave NW                  John R. Grimm
Washington, DC 20004                      Deepika H. Ravi
(202) 739-3000                            Annick Banoun
andrew.lipman@morganlewis.com             HWG LLP
russell.blau@morganlewis.com              1919 M St. NW, 8th Floor
                                          Washington, DC 20036
*Counsel to Dahua Technology USA,*        (202) 730-1300
*Inc.*                                    cwright@hwglaw.com



                                          James M. Cole
                                          Tobias S. Loss-Eaton
                                          Sidley Austin LLP
                                          1501 K St. NW
                                          Washington, DC 20005
                                          (202) 736-8000
                                          tlosseaton@sidley.com

                                          *Counsel to Hikvision USA, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font. I further certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 6,482 words according to the word-count feature of Microsoft Word.

/s/ Christopher J. Wright
Christopher J. Wright

## CERTIFICATE OF SERVICE

I certify that on this 30th day of August 2023, the foregoing brief was filed via CM/ECF. Service was accomplished on all parties or their counsel of record via CM/ECF.

/s/ Christopher J. Wright
Christopher J. Wright

# Appendix

# SCRM Criteria for Section 889 Part B

8/13/2020
Developed by: SCRM Review Board

## Criteria for Evaluating Exceptions and Applicability for Section 889 Part B

In general, the following decision tree can be used to determine whether a prohibition or exception applies per Section 889 Part B.

1. START

2. Does Prohibition under Part B Apply? - Is the equipment or service identified by the offeror/contractor as covered telecommunications equipment or service being **used** by the prime offeror/contractor?
    a. If No, STOP -- Prohibition under Part B does not apply.
    b. If Yes, continue through the rubric to determine if Prohibition under Part B applies.

3. Is the **equipment** identified by the offeror/contractor covered? - *If you are only reviewing a telecommunications service, skip section 3 and go to section 4 of the rubric.*
    a. Is the answer to any of the following "Yes"?
        i. Per (f)(3)(A) of Section 889 - Is the equipment telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation or a subsidiary or affiliate of either?
        ii. Per (f)(3)(B) of Section 889 - Is the equipment video surveillance and telecommunication equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company or a subsidiary or affiliate **AND** do any of the following purposes of the use of technology apply?
            1. Public Safety?
            2. Security of Government facilities?
            3. Physical security surveillance of critical infrastructure?
            4. Other National Security Purposes?
        iii. Is the equipment covered?
            1. If the answer to both 3(a)(i) and 3(a)(ii) of the rubric is No, STOP -- Prohibition under Part B does not apply.
            2. If the answer to either 3(a)(i) or 3(a)(ii) of the rubric is Yes, continue through the rubric to determine if Prohibition under Part B applies.

    b. Exception - Can the equipment route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles? (Assess whether the equipment has the ability to do so, not how the offeror/contractor chooses to use it; this

exception only applies to equipment that "cannot" route or redirect user data traffic or permit visibility into any user data, not equipment that "does not" based on its current configuration.)

      i.    If No, exception at Section 889(a)(2)(B) applies and Prohibition under Part B does not apply.

     ii.    If Yes, continue through the rubric to determine if Prohibition under Part B applies.

   c.   Repeat Section 3 for each piece of equipment identified by the offeror/contractor.

4.   Is the **service** identified by the offeror/contractor covered? - *If you are only reviewing telecommunications* **equipment***, use section 3 of the rubric and skip section 4.*

   a.   Is the answer to <u>any of the following</u> "Yes"?

      i.    Per (f)(3)(C) of Section 889 - Is the service telecommunications or video surveillance services provided by Huawei Technologies Company, ZTE Corporation, Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company or a subsidiary or affiliate?

     ii.    Per (f)(3)(C) of Section 889 - Is the service using telecommunications or video surveillance equipment produced by Huawei Technologies Company, ZTE Corporation, Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company or a subsidiary or affiliate?

    iii.    Is the service covered?

         1.    If the answer to both 4(a)(i) and 4(a)(ii) of the rubric is No, STOP -- Prohibition under Part B does not apply.

         2.    If the answer to either 4(a)(i) or 4(a)(ii) of the rubric is Yes, continue through the rubric to determine if Prohibition under Part B applies.

   b.   Exception - Note that the exception at Section 889(a)(2)(A) only applies to services provided to the Government; this exception does not apply to an offeror's or contractor's use of a service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements. Therefore, there is no exception to consider when evaluating an offer's or contractor's use of covered telecommunications services.

   c.   Repeat section 4 for each service identified by the offeror/contractor.

5.   Is the telecommunications equipment or service identified by the offeror/contractor prohibited? (please review additional information provided by the offeror/contractor about the equipment/service(s))

   a.   System

      i.    Is the covered equipment or service part of a system?

         1.    If No, STOP -- Prohibition under Part B does not apply.

         2.    If Yes, continue through the rubric to determine if Prohibition under Part B applies.

     ii.    What is the system (define the system) that it is a part of?

   b.   Substantial/Essential, Critical - Is the answer to <u>either of the following</u> "Yes"?

      i.    Is the covered equipment or service a substantial or essential component of the defined system?

     ii.    Is the covered equipment or service Critical Technology of the defined system?

         1.    If the answer to both 5(b)(i) and 5(b)(ii) of the rubric is No, STOP -- Prohibition under Part B does not apply.

2.  If the answer to either 5(b)(i) or 5(b)(ii) of the rubric is Yes, **Prohibition under Part B applies.**

If there is doubt about how to evaluate a specific component after using this decision tree and reviewing the examples, contact the SCRM Review Board.

3a